Mr. Richardson v. Correctional Medical Care. Good morning. My name is Elmer Robert Keech III. It is my privilege to appear this morning on behalf of the appellant, Bernita Richardson, who serves as the administrator for her husband, Jimmy Richardson's estate. As the court is aware by reading the briefing, Mr. Richardson died on January 27th, 2016 while in the Schenectady County Jail. The lower court, considering a motion for summary judgment, concluded by reading the record that there was sufficient factual evidence presented to sustain Section 1983 Civil Rights Claim for deliberate indifference to serious medical needs. The court then went on to find, based on the court's concern over an expert disclosure issue, that despite the fact that there was sufficient factual evidence to sustain a deliberate indifference to serious medical need claim, that there was insufficient evidence to sustain a state law negligence claim, which is evaluated at a much lower level. And in so doing, the court looked at the fact that the plaintiff in a submission that was over 2,000 pages long had provided an expert disclosure that was not supported by an expert's affidavit. Obviously, the appellant takes considerable umbrage with the fact that that opinion from Dr. Bruce Cherish, a cardiologist, was in fact supported by Dr. Cherish's sworn deposition testimony, where Dr. Cherish detailed to the district court, or detailed in his deposition, at great length, his opinions about two particular points. One of which really wasn't disputed, or with which the court agreed in its decision about the deliberate indifference claim. And that was the opinion about the fact that Mr. Richardson, who passed away from cardiac difficulties, urgently needed to have an evaluation by a cardiologist. And Dr. Cherish's expert disclosure details that, and then he proceeded to detail that in response to the questioning, during his deposition from the defendant's counsel. The court issued a highly critical decision of the present counsel, questioning the fact there was no affidavit in support of this expert disclosure. And the primary reason why there was no, I mean, certainly that was an oversight on my part, I'll acknowledge that. But- And you were on notice of the need for a sworn affidavit, weren't you? I believe that the appellees, your adversaries, question the admissibility of it in their reply briefs. And that's a kind of well-known requirement in a Med-Mal claim under New York law, isn't it? That is a well-known claim. I'll be the first to acknowledge that I've never done a medical malpractice action in the state courts outside of the New York Court of Claims. So I was not aware of that. But your adversary raised it in their reply. They certainly did raise it in their, they did raise it in their reply, that's correct. Yeah. And that could have easily been cured, and it's an oversight. Did you ever try to cure that? I did not, no. It was an oversight on my part. I didn't recognize the importance of that particular issue. But secondarily, I provided the man's sworn deposition testimony, where he detailed exactly what was detailed in his expert disclosure. He talked about the fact that Mr. Richardson needed to have an evaluation by a cardiologist in his deposition testimony. Let me ask you about that. This was the deposition taken by the defendants, correct? Correct. All right. What use were you going to be able to make of that? Dr. Cherish detailed in- No, no, I mean, you couldn't offer his deposition testimony. You would have had to have called him at trial, right? Yeah, absolutely, sure. Right, so to that extent, I mean, could you rely on the deposition as his sworn testimony in opposing summary judgment when you can't offer it? Yes, absolutely. And your support for that is? The support for that is that if you provide a submission to the court in an admissible form, and certainly a sworn deposition testimony- But that's not admissible by you. I thought you just acknowledged that. No, no, the- I think we're a little troubled by the fact that you could have cured this and we wouldn't be here at all. I think we would be here anyway because of the remainder of the opinion. But yes, that, I mean, I think that the court has to- Well, he thought it was conclusory. Isn't that what he said? Judge D'Agostino, yes, she concluded that it was conclusory, yes. So that's what you think would have had to appear in any event? Yes, correct. But how do we get past the failure to cure the problem with the failure to submit an affidavit? Well, in two ways. First off, his sworn deposition testimony details what his expert disclosure says. And I mean, it's deposition testimony. It's admissible for purposes of responding to a summary judgment motion. And I think that the rule is that if you can provide, it may not be admissible at the time, but if it's in a format in such a way that the admissibility would become evident at trial. I'm not sure if I worded that quite right, but there's plenty of case authority from this court and from others that, for instance, if I have statements that were provided, I believe were submitted to the court recently that are audio statements from inmates. I can call those inmates at trial and have them testify. And so even though that particular statement, which is an audio recording, is considered hearsay, they can be called at trial, and then their statement, which they would then convey during trial, would become admissible because they've made that testimony, and that happens all the time in a summary judgment context. So this is his sworn deposition testimony taken by the defendants. Certainly, I can rely upon that to oppose a motion for summary judgment. It's sworn deposition testimony, and the defendants don't- Could you address the district court's concerns about what she characterized as its speculative and conclusory nature? I mean, he had not reviewed medical records regarding Mr. Richardson, I think from before January, that detailed his comorbidities and other aspects of his health condition, and he was unable to respond to questions about how frequently ICD failures occurred. He hadn't examined the ICD. I mean, the foundation seemed limited, and he was basically largely saying, as I read it anyway, that based on his clinical experience, there was a reason that people interrogate ICDs every three months. And that was that they sometimes fail, and the death was the evidence of the failure. And she didn't find that well-grounded, well-explained, and ultimately conclusory. So what was wrong about that analysis? There's two, well, there's two components to Dr. Cherish's opinion. The first is that he needed an immediate evaluation by a cardiologist. And he detailed that in his deposition testimony, and that was the basis for the court to deny the motion for summary judgment on the federal claims. Relative to the second part of that, certainly there were extensive efforts made by both parties to obtain that defibrillator. And those efforts failed. It wasn't preserved. Nobody could find it. These are issues in terms of, well, this is speculative. That's a decision for the jury to make. I mean, he's a board certified cardiologist. This was his opinion. He supported his opinion by detailing that Mr. Richardson did not have any evidence of end stage heart failure, which is the argument that was put forward by the defendants, that that's what caused this. So you're saying that his deposition testimony was enough to support a departure from standard of care in terms of immediate referral for cardiologist evaluation. Yes. Regardless of the absence of an expert affidavit to that effect. Well, he detailed that in his deposition testimony. That's a sworn deposition testimony. May I just be sure I'm following this? If I understand it, your expert did not fault Ellis Hospital for not testing his pacemaker in connection with that admission. Am I right? It's correct. Okay. So moving past that, now he's released from Ellis Hospital. What, and be specific as to what date, what complaint is your expert saying should have triggered sending him to the emergency room or getting that pacemaker tested, which is I think, if I'm right, those are the two alternatives he says a doctor would have done? Yes. At what point? I believe that would have been when Dr. Fricky saw him, which at that point there was some notation of chest pain. But then there were following events, that's the other problem with the decision. So there were- Which date are we talking about? Ma'am, I apologize. I don't know the precise date. I can find that- Maybe before you get up and rebuttal, you can tell us which one, okay? Because I know there's the January 10th incident when he's seen by a nurse. But if I understand it, he's not seen by Dr. Frick. He, on January 11th, he sees, he's got a sick call with Dr. Frick. Again, unless I'm missing something, he's complaining of gastrointestinal and knee matters on that date, but no chest pain. So I just want to make sure I understand what your expert is saying the occasion for Dr. Frick's malpractices, okay? So just tell us when you get back up. Yes, ma'am. Good morning, may it please the court. My name is Jonathan Simer. I have the privilege of representing CBH Medical and Correctional Medical Care. And if one reviews the decision in this case, one can see that the lower court lumped those two defendants together. But the care provider at the time was CBH Medical PC. And the nurses are the employees of CBH Medical PC. And I would respectfully submit to your honors that on careful, conscientious review of the appellant's submissions on the summary judgment motion. The court found it lacking in two important manners. And all that is before this court is the state law medical malpractice negligence claim. It found that the evidentiary submission was lacking and what was submitted was inadmissible. And your honors correctly pointed out that if one looks to New York State for guidance on what is permissible and what needs to be submitted. And I believe the lead case on that is Alvarez versus Prospect Hospital. And that's back in 1986, and this law has not been modified one iota right up to 2023. And that is the person or entity opposing a summary judgment must come in with an expert affidavit on liability and on proximate cause. If that issue is raised by the proponents of summary judgment. Why isn't the deposition adequate to the state's requirement? Because as your honor correctly questioned a few moments ago, the key word is what is admissible by the appellant or the plaintiff in a med mal litigation. And plaintiff does not have the luxury of relying on a deposition from his expert or her expert. At the trial level of a case. I'm sorry, could you explain that the plaintiff has not had the luxury of relying? I mean, this is sworn testimony still about the relevant materials. Why is that inadequate as a basis for a claim? I can only say what the Court of Appeals has set forth in our state parallel system. And that goes from Alvarez to Simpson versus Edgehill and Fuer versus NG in each instance, the requirement is an affidavit from an expert with sufficient background. And that was not submitted. It was raised in the briefs. It was not- It was not in the reply brief, right? In my reply brief, yes. In your reply brief. It certainly was. It was also raised in the material statement of facts, I believe, in the primary. Brief on behalf of Dr. Frick. I don't think you've given us a case in which New York says that sworn deposition testimony would be inadequate. We've got unsworn letters from physicians are inadequate. But I don't see any reason why sworn deposition testimony isn't adequate. And looking in other circumstances, sister circuits have found it adequate in the Eighth Circuit, the Fourth Circuit, when there's been an unsigned expert report. Why shouldn't we take that view too? Well, I can only suggest to your honors that when we're presenting the argument to your honors and when we're presenting the summary judgment motion to the lower court, we're bound by the extent law at the time for the forum. But you don't have any state law that talks about sworn deposition testimony or did I overlook something? I do not. Okay, if you were to assume we did consider the deposition testimony, what's your other part of your argument? The other part of my argument is that Dr. Cherish's testimony is predicated entirely on speculation, stated in the conclusory faction. And if your honors look at the nursing notes made contemporaneous with the event on those three occasions, and that would have been on January 9, January 10, and on Dr. Fricky's evaluation, which I believe was January 12. There were no complaints of chest pain. In fact, Mr. Richardson denied chest pain at those times. I saw that, but you know we have to look at all of this in the light most favorable to the plaintiff at this point in the proceeding. So the doctor is an experienced cardiologist. And he says that when he presented to Dr. Frick in complaint of chest pains, and Dr. Frick knew that he had a pacemaker, that an experienced cardiologist would have either sent him to the emergency room or gotten a test on the pacemaker, why isn't that enough? I mean, you would certainly have a challenge to that at trial, but why isn't it enough to clear summary judgment? Because the fact that he's making up to support that, and in whole cloth, is that there was chest pain. The nurse, Nurse Powers, and the next nurse, I believe her name is Killen. I apologize if I don't have that quite right. But in each instance, they queried him, and there was a denial. I do not have chest pain. My wrists hurt. I feel like my blood pressure is low. That's why I asked your adversary, which event? There isn't an event. The doctor to say that there should have been said, you're saying there's no event. He said that a simple report to a corrections officer that would get a medical professional to the floor. Would trigger the need for a cardiac evaluation. Did he also say, not just documented complaints of chest pain, but also episodes of dizziness, low blood pressure, falling. And those are all consistent with events caused by a failing ICD? Well, I think I asked Dr. Cherish at the deposition that a sense of dizziness has a myriad of potential issues. He denied racing heart, health patients. He denied any chest pain. When a defibrillator fires, it's like a punch to the chest. There were no such complaints in this record at all. There were complaints of low blood pressure. In his sense, but not substantiated by the blood pressure reading contemporaneous with the complaint. They were well within normative ranges. No racing heart, pulse rate was exactly within normal range. He was conscious, sitting on the bunk, talking, joking. So please, the court, I would respectfully submit that the lower court's decision was well-founded and worthy of appeal, or worthy of affirmance on appeal. Thank you for your attention. It's my colleague, Mrs. Butler's turn. Good morning. My name is Karen Butler, and I represent Dr. Fricke. I would like to say that the plaintiff's argument, the appellant's argument that the deliberate indifference finding by Judge D'Agostino somehow should incorporate medical malpractice. Medical malpractice is not a lesser included offense in deliberate indifference. They are entirely different statutes, entirely different standards, and require entirely different proof. And it's clear and undisputed that a medical malpractice case requires expert testimony that, first of all, what the standard of care is. That there was a deviation from accepted standards of care, and that particular deviation caused the injury claimed. That is not a requirement under the deliberate indifference statute and case law. Secondly, it's clear from this court's decisions, including the recent decision of Sorky versus EI Dupont. That was a 2021 decision that Judge D'Agostino has broad discretion to determine what evidence is admissible. She reviewed the entire record, and she found that the expert report without an affidavit clearly was not admissible. She also did not find that either the transcript of the deposition nor the report had any foundation for Dr. Tarasch's opinions. Dr. Tarasch's opinions were conclusory. He acts like death is a raised IPSA event, that the death itself proves it. The fact that he died means that the defendants were negligent. Well, that sounds to me more like you're questioning whether he was a competent expert to testify, but there was no Daubert challenge raised here to him. The challenge was to the foundation of his opinion, because he did not review the records. He did not review any of his previous medical records, which went back, I believe, 20 years. He didn't review any of his previous EKGs. But wouldn't that go to whether he's competent to offer an opinion? Well, it goes to whether he's competent to offer an opinion in this particular case when there's no- I understand that, and that's not the challenge. That wasn't the challenge here, that even if he did it under oath, he wasn't competent to offer an opinion here because of his failure to look at the records. Well, Judge D'Agostino found that his testimony lacked foundation and was conclusory. But I don't think, is it really fair to say that the opinion is based simply on the fact of death, that it must have been an ICD failure because of the death? He also relied on the family history of Southern death. The fact that the treating clinicians had deemed an ICD appropriate. The fact of his death without evidence of mechanical catastrophe. And also the fact that there was no evidence of end stage COPD or clinical pneumonia. So the two experts are taking issue with the cause of death, but they both point to evidence supporting their position. But it's, with all due respect, your honor, it's not evidence just because someone dies. Everyone with an ICD eventually dies. People, just because we'd all have an ICD if it made you live forever. But in light of the factors that Chief Judge Livingston has just enumerated, and the fact that just days earlier, on January 4th or 5th, Mr. Richardson was taken to the hospital after complaining of chest pain, that he had the dizziness that the Chief Judge alluded to, and feelings of low blood pressure. I mean, he had complaints, physical nature, kind of virtually every day, that no one seemed to be questioning, that he was malingering in some respect. I mean, he had a lot of comorbidities. And so I'm having trouble understanding why it was consistent with the standard of care for on January 12th, when Dr. Frick saw Mr. Richardson, not to refer him for treatment. And if you have a pacemaker, an ICD, then you have, but plus these additional elements that we've just described, I would think that you would want an evaluation about whether everything is, whether the ICD is operating, and whether there's some other factor that's contributing that could be very serious. But he also, he had no evidence that there was any malfunction of his ICD, and he had- But you would need that, is my point, is that the fact that he had the ICD and that he had daily complaints. And the GI complaint on January 12th also suggested to me that could be related to a heart problem. Why wouldn't you, why wouldn't it be standard of care to refer him for a cardiology evaluation? But you need competent evidence to say it's a deviation from accepted standards of care. His ICD had- That was the thrust of Dr. Cherish's testimony. Yes, he said that the death was a kind of prompt facial evidence of an ICD failure, but he also said that at least you would refer for a cardiology evaluation, didn't he? Well, when he was seen on the 12th, he clearly was complaining of GI distress after eating spicy food. Which, when we deposed Dr. Cherish, he said that could have been related to the fact that he had gastric bypass surgery. He didn't equate that as being a complaint of a cardiac in nature. But again, I'm looking at the whole course of events from his readmission to the correctional institution on January 4th or 5th through the 12th when Dr. Fricky saw him in person. Well, Dr. Fricky saw him on the 5th, which was the day after, really the morning after he came back from the emergency room, and did a complete evaluation, and ordered his medications. And then he saw him again on the 12th because Dr. Fricky only works one day a week. So he saw him the very next day, he was there at the jail. It's undisputed that Dr. Fricky was not called or told about his previous complaints of chest pain. There was a note written on the 10th in the chart that Dr. Fricky did not see. But if he had seen it, it would have said that he had complained of chest pain, and when the nurse went to see him, he denied chest pain. When Dr. Fricky saw him, he specifically asked him if he had chest pain, he denied chest pain. The day before he saw Dr. Fricky on the 12th, his main complaint was that he wanted to have a dental evaluation. So there weren't clear signs to Dr. Fricky, the man had just been in the hospital. His ICD had just been checked in October, and it was checked every three months. If he had remained in jail, presumably, Dr. Fricky would have followed that schedule and had his ICD checked when it needed to be checked again. But it wasn't due to be checked, and there wasn't any evidence of any failure of the ICD that the people that Dr. Fricky was aware of. Later, some inmates said that he had been passing out in unsworn testimony. But they also said that the inmate specifically told them not to tell anybody, because he didn't want people to know that he had fallen down or had passed out. So that information certainly wasn't passed on to anyone in the medical department, and certainly not to Dr. Fricky. As I said previously, he had only saw him both days he was working while he was at the jail, which was one day a week. Thank you. Thank you. Judge Raji, in response to your question, I would respectfully suggest that January 12th, 2016 would be the date on which Dr. Fricky should have acted. And based on what? I'm looking at what he was told by the inmate. There were two, I apologize, ma'am. No, go ahead. There were two complaints of chest pain made by Mr. Richardson in the days prior to that. There was one made to a nurse and one made to a corrections officer. I can't say that the complaint to the corrections officer- What's the evidence that you would be able to offer that that came to Dr. Fricky's attention? Certainly, well, that's part of the problem, is that Dr. Fricky has a nursing chart. But because of the policies and procedures of correctional medical care, we don't know if Dr. Fricky actually reviewed the chart. Certainly, that is required for a doctor to review the chart, but they had these charts all over the place. And Dr. Fricky acknowledged that he didn't- But it is on the chart. But it is in the chart that he complained to a nurse three days before about chest pain, yes. And just to kind of get back to this point about the expert disclosure and the deposition issue. In their statement of material fact to the court in support of the motion for summary judgment, the defendants didn't bring Dr. Cherish's testimony to the court's attention, didn't bring his report to the attention, didn't bring his expert testimony to the court's attention. And this is in support of a claim to be made in good faith that there are no uncontested material facts here. The plaintiff has a right to rely on sworn deposition testimony that was taken by the defendants. The defendants don't dispute in their briefing that the sworn deposition testimony of Dr. Cherish mirrors the findings that he provided in his report. Instead, there's an effort made to claim, well, this is unexecuted. Dr. Cherish was under oath in front of a court reporter that was chosen by the defendants and was examined by both Ms. Butler and Mr. Seimer during the course of that proceeding. I'm sorry to interrupt, but they also point out that the deposition wasn't signed by him ultimately. Does that affect its usefulness here? No, I believe under the rules of civil procedure, if 30 days pass and you haven't signed the deposition transcript, that then it becomes the record of the deposition. He was- Their objection has no merit. I don't even see how, if you cross-examine, what my argument would be at trial, if they're cross-examining my expert with his deposition, well, he never signed it, so it doesn't have any validity. That's just not how trial evidence would certainly work. They would have every right to cross-examine Dr. Cherish with that document. He had a right to read and sign. He didn't exercise the right to read and sign. And so, this was sworn deposition testimony taken in front of a court reporter under oath. Doesn't get any more direct than that in terms of something being admissible evidence. It would certainly be admissible, for instance, if Dr. Cherish was absent for some reason. There would be an argument that I might even be able to get that deposition testimony in if he had passed away. We're on abuse of discretion review for the admission decision by the district court. I'll acknowledge that there's authority that details that this is abuse of discretion, but this also is in the context of summary judgment. And that kind of brings me back to another point, I believe, that you raised, Judge Carney, that it wasn't just the issue about Brugada syndrome and the defibrillator. It was, this guy should have been sent to a cardiologist. He should have been evaluated when he's presenting with these symptoms. And he presented with the symptoms later, and that would be the case against correctional medical care where there was no action taken by those nurses. It's not even reflected in the medical records. It's reflected in corrections records that he was complaining of chest pain, low blood pressure, and was evaluated by a nurse, and it never made it into the medical records. So that aspect of, if it is reviewed for abuse of discretion and not de novo, certainly it's an abuse of discretion to say to a plaintiff, you can't rely on your own expert's sworn deposition testimony to oppose a motion for summary judgment. You can't rely on his deposition testimony to support his expert opinion. One of the concerns I have with the doctor's evaluation is he does reference information identified after the death. So about the inmate saying he had been weak for the past two days, that he had fallen five times, that another inmate heard him complaining about chest pains. Was the doctor entitled to rely on any of that? Yes. For purposes of his opinion that this is indicative of a problem with the defibrillator, absolutely. But, well certainly another inmate hearing in the medical unit that the deceased had been complaining of chest pains. That's going to be plain hearsay. How do you say the doctor's entitled to consider that in deciding that Dr. Fricky was acting in a, you know, was chargeable with malpractice? Well, these are, I think, some evidentiary issues that are beyond what the district court evaluated. No, because this is why I was trying to get you to what the doctor could rely on. Because the district court thought his opinion wasn't adequately supported. So, another inmate says that he had been weak for the last two days. I mean, that's a statement made on January 17th. Dr. Fricky had last seen him on the 12th, right? Well, there are two defendants here. No, am I right? That's correct. Okay. There are two defendants here. There's correctional medical care, and then there's Dr. Fricky. But are you saying that these statements about what inmates said after the death could be considered by the doctor in deciding what the actions of the health professionals as a whole were? When you're referring to the doctor, you're referring to my expert, Judge Radjic? Yes, yes, doctor. I believe that most, if not all, of the statements that Your Honor has just detailed were also provided in a report from the New York State Commission of Correction. But these are statements made after the fact. There's no evidence that I saw, unless I overlooked it, that any of these facts were known to the medical professionals beforehand. As Judge Clark said, none of them even said that the deceased said not to tell about the falls. There were facts that were known to medical professionals, because medical professionals, even though they didn't keep records, were present in the jail unit, and that's reflected in the jail security models. But my concern is how does your expert rely on this in charging others with medical malpractice if there's no evidence that they, too, were aware of these facts? Judge Radjic, I think Judge Cherish was relying on that evidence that you just described to detail his opinion about problems with the defibrillator. Dr. Cherish, in his opinion, talks about January 5th and January 12th. He doesn't talk, when detailing Dr. Fricke's conduct, he does not talk about- I think that January 11th is when he has the sick call and does not complain of pain, but the next day, January 12th, is when there's the vitamins issue, the dental issue. I have January 10th as when he complains of chest pains, and then when the nurse shows up, he denies chest pains. So we're talking about the same dates? When you say January 12th, what am I not looking at in the record that says chest pains on January 12th as opposed to January 10th? There's nothing in the record that reflects that Mr. Richardson complained about chest pains on January 12th. He complained about chest pain on January 10th, I believe. Okay, so January 10th is the chest pains date. Yes.  Thank you for considering my argument, Your Honor. Thank you, Your Honor. Thank you all, and we'll take the matter under advisement.